Filed 11/18/20  P. v. Diaz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>JAVIER LOPEZ DIAZ,<br><br>    Defendant and Appellant. | C087956<br><br>(Super. Ct. No. 16FE019559) |

Defendant Javier Lopez Diaz repeatedly molested his then-girlfriend's younger sister, S.D., when she was between the ages of seven and 15 years old.  A jury found him guilty of multiple sex offenses, including three counts of committing a lewd and lascivious act on a child under 14 years of age (Pen. Code, § 288 subd. (a); counts two, three, and four),[1] five counts of committing an aggravated lewd and lascivious act on a

---

[1]  Undesignated statutory references are to the Penal Code.

1

child under 14 years of age (§ 288, subd. (b)(1); counts five through nine), three counts of forcible oral copulation, (former § 288a, subd. (c)(2)[2]; counts ten, eleven, and thirteen), and two counts of forcible rape (§ 261, subd. (a)(2); counts twelve and fourteen).[3] The trial court sentenced him to an aggregate term of 70 years in prison, and he timely appealed.

On appeal, defendant contends the judgment must be reversed due to insufficient evidence, instructional error, evidentiary error, ineffective assistance of counsel, and sentencing error. We will modify the judgment to impose the mandatory court operations and court facilities assessments (§ 1465.8; Gov. Code, § 70373), and to reflect one additional day of custody credit. As modified, the judgment is affirmed.

## BACKGROUND

We summarize the facts adduced at trial; additional information relevant to the claims raised on appeal is set forth in the Discussion as needed.

*S.D., Ella, and Defendant*

S.D., aged 26 when she testified at trial, was born in Belarus in November 1991. In June 1997 her family moved to Sacramento. At that time, she was five years old and her older sister, Ella, was 22 or 23 years old. Because of the age difference, Ella was "just like a mother" to S.D.

---

[2] Effective January 1, 2019, section 288a was amended and renumbered. The offense of unlawful oral copulation is now codified at section 287. (Sen. Bill No. 1494 (2017-2018 Reg. Sess.) ch. 423, § 49.) The offense defendant was convicted of in counts ten, eleven, and thirteen is currently codified, without substantive change, at section 287, subdivision (c)(2)(A).

[3] The jury found defendant not guilty on count one, committing a lewd and lascivious act on a child under 14 years of age. (§ 288, subd. (a).) The incident giving rise to this charge involved defendant allegedly touching S.D.'s vagina over her swimsuit in a swimming pool, when she was around seven years old.

In February 1998 Ella began dating defendant and moved in with him in July 1999.  At that time, she was 24 or 25 years old and he was 37 or 38 years old.

*Counts Two and Three:  Lewd and Lascivious Acts*

In 1999 Ella and defendant took S.D. to Disneyland for her eighth birthday.  On that trip, defendant "grope[d]" S.D. several times.  While the group was at Disneyland, defendant rubbed S.D.'s vagina over her clothes on at least two rides.  S.D. did not tell defendant to stop; she did move his hand away and tried not to sit next to him on rides.  Defendant's acts at Disneyland were the bases for counts two and three.

Although S.D. knew the touching was wrong, she did not tell Ella about it.  She felt ashamed and blamed herself for what had happened.  S.D. explained that she did not disclose the abuse because Ella already had a "bad relationship" with their family and she did not want Ella to be rejected by the family.

*Count Four:  Lewd and Lascivious Act*

Beginning when she was around seven or eight years old, S.D. regularly spent the weekend with Ella and defendant at their apartment in downtown Sacramento.  Initially, S.D. and Ella slept together in the bedroom while defendant slept on the couch.  However, after the "first few weekends," he slept with them in the bedroom and in the bed.  At first, he wore a T-shirt and/or underwear to bed, but later he slept naked.  Ella never commented on the situation.

When S.D. was between the ages of seven and 10 years old, defendant held her around her stomach, put his hand between her legs on her vagina, and pressed his erect penis against her lower back or buttocks while she was trying to sleep.  She repeatedly told him "no" and tried to move away but he did not stop.  He told her that he was not doing anything wrong, and that she was "seeing things," lying, and acting crazy.  She eventually gave up on trying to stop defendant from touching her because "it never worked."  This made her angry, since she knew what was happening and felt like she "didn't have a voice."  During this same time period, defendant walked around his

3

apartment with no underwear, rubbed his erect penis in front of S.D., and bounced her on his lap and then pressed her down on his erect penis. Defendant's acts of pressing his erect penis against S.D. in bed were the bases for count four.

S.D. did not tell her parents about defendant's behavior because she felt ashamed and was afraid of being abandoned. When asked why she feared abandonment, S.D. said, "Because I felt like what was happening to me was really awful and it wasn't proper and it was the worse [*sic*] thing that I could have ever done."

*Counts Five and Six: Aggravated Lewd and Lascivious Acts*

When S.D. was between the ages of 12 and 13, defendant started "dry-hump[ing]" her at his apartment while Ella was away. He would ask her to lie face-down on his bed and then get on top of her. She would look out the window and try to "tune out" what he was doing. Defendant's "dry-humping" of S.D. was the basis for count five. S.D. explained that she complied with defendant's request to lie down on the bed because she "knew [she] couldn't tell him no," and because he would treat her "poorly" if she refused. By this time, S.D. knew that defendant would "berate" and punish her if she failed to comply with his demands. She felt like "[t]here wasn't a choice" and she "couldn't tell him no" because, at that point, the molestation was "deeply imbedded" and something she "had to do." She explained that she was afraid of defendant because she had seen him throw things and threaten Ella during arguments. S.D. further explained that she felt "terrified" whenever defendant and Ella argued.

When S.D. was around 12 years old, she complained of having a stomachache. Defendant took her into the bedroom and put his hand into her underwear and touched her vagina. She said "no," and then lifted his hand and told him, "This is where it hurts." Although she was "visibly angry," he smiled and ignored her. He put his hand back into her underwear, "cupp[ed]" her vagina, and then inserted two fingers. S.D. did not call out to Ella for help because she "didn't feel like [she] could." This incident was the basis for count six.

4

S.D. explained that she had become visibly angry with defendant when he was touching her on other occasions, but he never addressed her anger. He just continued to touch her, which made her feel angrier. When asked, S.D. said that she never did anything when she became angry at defendant because she "knew it would make [the situation] worse."

*Counts Seven and Eight: Aggravated Lewd and Lascivious Acts*

Beginning when S.D. was 11 or 12 years old, she and defendant occasionally went on walks to a parking structure near his apartment and took the elevator to the top floor to enjoy the view. On a few occasions, defendant pressed her against a railing from behind and rubbed his erect penis against her lower back and buttocks. On one occasion when she was 12 or 13 years old, defendant pressed her against a railing from behind and then reached under her skirt and rubbed her vagina over her underwear. Two incidents of defendant touching S.D. in the parking structure formed the bases for counts seven and eight.

S.D. explained that she did not attempt to avoid going on walks to the parking structure with defendant because "[i]t wouldn't have made a difference." She further explained that she did not say anything to him during these incidents; she "just . . . tuned him out" when he was touching her in a sexual way.

*Count Nine: Aggravated Lewd and Lascivious Act*

Around a month before S.D. turned 13 years old, Ella and defendant decided to take her to a Halloween "house party" dressed in a "school-girl" outfit, which made her feel exposed. The outfit consisted of a shirt which tied under her breasts and exposed her midriff, a miniskirt, white lace underwear, thigh-high socks, and high-heeled shoes. After S.D. changed into the white lace underwear, defendant rubbed her vagina over her underwear. This incident was the basis for count nine. S.D. noted that it was defendant's idea for her to wear the white lace underwear, which belonged to Ella.

5

When S.D. was asked whether defendant had touched her on any other occasion when she was between the ages of seven and 13 years old, she said that he was "almost constant[ly]" touching her in a sexual way during that time period. She described the touching as "routine." At trial, she recounted the incidents that stuck out in her mind for one reason or another and said that the rest of the incidents all bled together. She explained that the constant molestation made her feel isolated, alone, and ashamed. She felt like there was no way to escape from defendant; her only hope was that Ella would break-up with him. But that never happened. Instead, the sexual conduct escalated from touching and "dry-humping" to oral sex and sexual intercourse.

*Count Ten: Forcible Oral Copulation*

When S.D. was 13 years old, she orally copulated defendant for the first time. At that time, defendant and Ella were living at a house that was about a 20-minute drive from S.D.'s parents' house. When defendant would drive S.D. home, which was a common occurrence, he always started an argument, "[u]sually because [she] was begging to go home." On one such occasion, he pulled into a parking lot in an industrial area at around 8:00 p.m. and yelled at her. He told her that the only way he would forgive her and take her home was if she orally copulated him and swallowed the ejaculate. She was crying while he was yelling at her. After she orally copulated him, she spit out the ejaculate. This made defendant angry, but he eventually calmed down and drove her home. This was the basis for count ten.

S.D. explained that she was too afraid to refuse defendant's demand for oral sex. When she was asked to describe what she was thinking about at the time, she said, "That I needed to do a good job or the consequences might be worse." The consequences she feared included "everything from violence to just berating."

6

*Counts Eleven and Thirteen: Forcible Oral Copulation*

When S.D. was 14 and 15 years old, she orally copulated defendant numerous times. She could not recall the specific details of each incident. She explained that the details were "fuzzy" because the incidents occurred frequently, and because they tended to be traumatic, since he would scream, yell, and threaten her. At trial, S.D. recounted two additional incidents when she orally copulated defendant.

In the first incident, S.D. was between the ages of 14 and 16 years old. During an argument in the car, defendant pulled over into a parking lot; it was cold, rainy, and very late at night. Afraid and crying, she orally copulated him.

The second incident occurred during a family vacation when S.D. was around 15 years old. One evening, she, defendant, and several other people were hanging out at the pool area of a hotel. At one point, a "young guy" started "hitting" on her, which made defendant jealous.[4] Thereafter, defendant cornered her in the pool and tried to kiss her, but she turned away, which made him angry. She started to cry and left the area. When he found her, he was still angry. As they talked, she "was crying, pretty much begging for forgiveness because [she] was just tired of being yelled at." He forgave her after she orally copulated him in his hotel room and swallowed some of the ejaculate, which was a "common condition" to obtain his forgiveness "[e]arly on." Shortly thereafter, Ella came into the room. S.D. was crying and defendant was in the shower. Ella and S.D. did not talk about why S.D. was in the room alone with defendant or why she was crying.

These two acts of oral copulation were the bases for counts eleven and thirteen.

S.D. explained that she never initiated oral sex with defendant, and that there were times when she knew she "had to," even though he did not ask, "because there was an argument" and the oral sex would "assuage the situation."

---

[4] When S.D. was in the hot tub, she realized that there was alcohol in her drink. The person sitting next to her told her that defendant had put it there.

*Count Twelve:  Forcible Rape*

When S.D. was 14 years old and a sophomore in high school, defendant had sexual intercourse with her for the first time.  After Ella left the house, he led S.D. into the bedroom and had her lie on his bed.  She cried and looked away as he penetrated her.  She could not recall if she told him "no," but she was "reluctant as always" and did not remember "being given a choice."  At that point, she felt like there was nothing she could do to make him stop.  She did not tell Ella about the incident because she felt ashamed.  This episode formed the basis for count twelve.

S.D. explained that, prior to this incident, defendant had repeatedly pressured her to have sexual intercourse with him during her entire freshman year of high school.  He told her that she needed to have sex with someone she trusted in order to be prepared for high school.  He said that it would "benefit [her] greatly" to have sex with him because he was like a close member of the family and would not hurt her.  He claimed that it was Ella's idea and warned S.D. that if she refused to have sex with him, she would have a difficult time in high school with her peers and end up with someone who would hurt her.  S.D. repeatedly refused defendant's demands for sex, but he did not respect her wishes.  Instead, he continued "to argue his point."

*Count Fourteen:  Forcible Rape*

When defendant was a sophomore, junior, and senior in high school, her school day started at a later time on Wednesday.  During her sophomore year, defendant routinely showed up at her parents' house on Wednesday mornings and had sexual intercourse with her after her parents had left for work.  He would then drive her to school.  In November of that school year, she turned 15 years old.  Thereafter, he continued to have sex with her on Wednesday mornings at her parents' house.  This occurred throughout her sophomore year and into her junior year of high school.  The prosecution identified an act of sexual intercourse on one such Wednesday when S.D. was 15 as the basis for count fourteen.

*Disclosure of the Sexual Abuse*

After her parents moved, S.D. stayed with Ella and defendant during the week because they lived closer to her school. This arrangement began at the end of her junior year of high school. Thereafter, including throughout her senior year of high school, defendant regularly had sexual intercourse with S.D. on mornings when Ella was out of the house. When asked, S.D. said that the tried to tell him "no," but "[b]y that point, it didn't matter." She explained that she had told him "no" many times but "[i]t got to the point where he would say, 'Don't ever tell me no.' So when [she] would say no is usually when the arguments would start." The arguments would often end with her orally copulating him. This pattern continued until she graduated from high school.

Following graduation, S.D. continued to live with defendant and Ella while she attended college at Sacramento State. During that time period, defendant continued to have sexual intercourse with S.D. on a regular basis. The sexual relationship continued until she was 24 years old. S.D. explained that defendant was very controlling and abusive to her when she was between the ages of 18 and 24. She did not have a driver's license and he did not allow her to go anywhere.

When asked, S.D. admitted that she gave defendant birthday cards and Valentine's Day cards but only "because that would appease him, and if [she] didn't, [she] would most likely get in trouble." She explained, "My life was if he's happy, I would not be mistreated. So I went out of my way to try and appease him. Also, he would always give me things, and it was just implicit that I do the same in return." S.D. indicated that she never had "fond feelings" for defendant and never cared for him; she would only give him things or show him affection to keep him happy.

In April 2016, when S.D. was 24 years old and had obtained her undergraduate degree and a master's degree, she disclosed defendant's sexual abuse to Ella and her parents. The disclosure occurred after defendant and Ella had an argument, and S.D.

9

decided to end her relationship with defendant and move home. Shortly thereafter, S.D. reported the abuse to law enforcement. At that time, defendant was 54 years old.

S.D. was crying hysterically when she told Ella about the abuse. Ella claimed she had no knowledge of the abuse. She told S.D. to calm down and assured S.D. that everything was "fine." Ella said that defendant had "mention[ed] something, and that it was okay and [S.D.] was still welcome to come and live with them," i.e., Ella and defendant. Following this conversation, S.D. felt like she could no longer trust Ella. S.D. felt betrayed when she learned that Ella had told their mother that S.D. and defendant were both at fault for what had happened.

*Pretext Phone Calls*

During the police investigation into the allegations of sexual abuse, S.D. made two pretext phone calls to defendant in an attempt to get him to talk about the abuse. The calls were recorded and played for the jury.

The first phone call occurred on defendant's birthday in early July 2016. In the beginning of that call, defendant told S.D. that he and Ella were no longer together. Shortly thereafter, S.D. said that she was calling because she had read the letter he had written her, which indicated that he had "fallen for [her]." In response, he said: "You know I fell in love with you." After she indicated that they had been together for 10 years and pressed him on when he fell in love with her, he said: "[S.D.] I fell head over heels. I loved you from the minute I saw you. I saw this scruffy little girl and I thought that you were like the sweetest thing because the minute I looked into your eyes it was like me the sun chasing the moon and I couldn't stop. And then you grew up to be a woman and how can any man resist you? I'm not saying that you know . . . I'm just saying that there is just something about you and it doesn't matter what other people say. . . . When S.D. asked defendant why he did not wait until she was older, he said, "I wanted to confess to your dad many years ago and I wanted to just tell him up front that I had fallen in love with you. And I always thought that maybe like anyone else age has

10

nothing to do with anything, it's just the way you feel about someone." When she asked him whether he thought it was wrong for him to repeatedly have sex with her when she was 14 years old, he did not deny that he had engaged in such conduct. Instead, he changed the subject. Later in the conversation, defendant, again, mentioned that he fell in love with S.D. and did not deny that he had sex with her when she was 14 years old. He eventually hung up after she pressed him on why he raped her when she was 14 years old.

S.D. made a second pretext phone call around six weeks later. In that call, defendant talked about how he loved S.D. and still wanted her in his life. He again admitted that he fell in love with her when she was "a little girl"; the first time he saw her. At one point she said, "I need to know that you are sorry for what you did to me at fourteen. I need to know. I was in high school and I didn't know any better. I still have nightmares about you. That's not normal." In response, he said that he was sorry she felt that way and suggested that they get together and talk about what had happened. He eventually hung-up on her after she pressed him on whether he was sorry for having sex with her when she was 14 years old and for touching her when she was young.

Defendant called back immediately. This call was also recorded and played for the jury. Defendant again told S.D. that he loved her and wanted her back. When she asked whether he was sorry for having sex with her when she was 14 years old, he said, "I'm sorry [S.D.]" She replied, "OK I forgive you." He then repeated, "I'm sorry." He explained that he had gravitated toward her because she was lonely and had gone through "the same shit [he] went through." He then disclosed that he had been raped by a man when he was a young boy. He did not deny S.D.'s accusation that he had engaged in similar conduct by "fondling" her when she was eight years old. He also did not deny her accusation that he raped her when she was 14 years old and touched her as a "kid." Instead, he said, "Well a lot of that was accidental, [S.D.] but okay." When she insisted that his conduct was not accidental, he said "[o]kay." Shortly thereafter, he said: "I'm asking for forgiveness, showing remorse, I'm trying to save my soul. And if I don't have

11

to save my soul because I am going to end up behind bars then so be it. Then that's what . . . I ended up doing for myself. If that is what you want then so be it. Then I'm willing to do it."

## DISCUSSION

### I

### *Sufficiency of the Evidence*

The defense theory was that defendant and S.D. engaged in a consensual sexual relationship after she turned 18 years old, and that she fabricated her claims of molestation after their relationship ended badly. The defense posited that S.D. was lying about the molestation because she did not want her family to reject her for having a sexual relationship with her sister's boyfriend. The alternative contention was that, even if S.D. was telling the truth about her claims of molestation, there was no evidence supporting the conclusion that the molestation was accomplished by force or duress. Defendant did not testify at trial. Ella and several of defendant's relatives testified as defense witnesses.

On appeal, defendant contends that his convictions on counts five through fourteen must be reversed for insufficient evidence. He does *not* argue there is insufficient evidence to support the conclusion that he committed the acts giving rise to those offenses, or to support the conclusion that S.D. was under the age of 14 as required for his aggravated lewd and lascivious conduct convictions (counts five through nine). Rather, he argues that there was insufficient evidence to support the prosecutor's theory that the acts underlying counts five through fourteen were accomplished by duress. We disagree.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

12

credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715 (*Edwards*).) " 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id*. at p. 357.)

B. *Analysis*

As we have explained, the jury found defendant guilty of committing 13 sex offenses. As relevant here, the jury found him guilty on counts five through nine, which charged him with committing a lewd and lascivious act on S.D. when she was under 14

13

years of age by means of force, violence, duress, menace, and threat of great bodily harm; counts ten, eleven, and thirteen, which charged him with accomplishing an act of oral copulation with S.D. against her will by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury to her; and counts twelve and fourteen, which charged him with accomplishing an act of sexual intercourse with S.D. against her will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to her. During closing arguments, the prosecutor focused on the element of duress with respect to the aggravated/forcible component of counts five through fourteen.

As noted above, defendant contends that reversal is required because there was insufficient evidence that S.D.'s participation in the acts giving rise to these offenses was accomplished by duress.

In the context of an aggravated lewd and lascivious act on a child under 14 years of age (§ 288, subd. (b)(1)) and forcible oral copulation (former § 288a, subd. (c)(2)), "duress" means " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004; see CALCRIM No. 1015 (Oral Copulation by Force, Fear, or Threats); CALCRIM No. 1111 (Lewd or Lascivious Act: By Force or Fear).) In the context of forcible rape, section 261 defines "duress" in the same manner, except that it omits the term "hardship" from the definition. (§ 261, subd. (b); *Leal*, at p. 1007 ["deletion of the term 'hardship' from the definition of 'duress' applies only to the rape and spousal rape statutes"]; see CALCRIM No. 1000 (Rape or Spousal Rape by Force, Fear, or Threats).)

With respect to the offenses at issue here, the jury was required to determine the existence of duress by considering the totality of the circumstances. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*); § 261, subd. (b); CALCRIM Nos. 1000, 1015,

1111.)  Relevant factors include the age of the victim, her relationship to the defendant, relative size and age disparities, location of the molestation, the position of dominance and authority of the defendant, and past and present conduct of the defendant toward the victim, including such things as defendant's continuous exploitations of the victim and whether the defendant made threats of harm to the victim or physically controlled the victim when the victim attempted to resist.  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13-14 (*Cochran*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12. (*Soto*); *People v. Cardenas* (1994) 21 Cal.App.4th 927, 940; *People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 238-239; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51, disapproved on other grounds in *Soto*, at p. 248, fn. 12.)  "The very nature of duress is psychological coercion."  (*Cochran*, at p. 15.)

Our Supreme Court has made clear that "the legal definition of duress [under section 288] is objective in nature and not dependent on the response exhibited by a particular victim."  (*Soto, supra,* 51 Cal.4th at p. 246.)  "[D]uress is measured by a purely objective standard."  (*Ibid*.)  "Consistent with the language of section 288 and the clear intent of the Legislature, the focus must be on the defendant's wrongful act, not the victim's response to it."  (*Ibid*.)  There must be a " 'direct or implied threat' " (*People v. Leal, supra*, 33 Cal.4th at p. 1004) or exploitation of the victim's fear (*Soto, supra*, 51 Cal.4th at p. 251 (conc. opn. of Werdegar, J.)) in accomplishing the act.  A rational trier of fact can find duress within the meaning of subdivision (b) of section 288 even if there is no substantial evidence of overt duress if the trier of fact decides that the "inherent imbalance of power in an encounter between a child and an adult bent on sexual conduct" (*Soto*, at pp. 245-246) presented in the charged incident.  A perpetrator may use duress against the victim even if the perpetrator's conduct does not ultimately influence the victim's state of mind.  (*Id.* at p. 243.)  Thus, while the section 288, subdivision (b)(1)

15

punishes defendants who employ duress, there is no requirement to prove the victim was coerced or complied *because of* that duress.

Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence from which a reasonable jury could have concluded that the challenged offenses--committed when S.D. was aged 11 through 15--were accomplished by duress. The evidence showed that defendant was in a position of dominance and authority over S.D. from when she was a small child, and that he used this position to intimidate, manipulate, and psychologically coerce her into participating in sexual acts through fear and express or implied threats of consequences for disobeying him.

As we have set forth, at all relevant times defendant was the boyfriend of S.D.'s older sister, and was significantly older that both Ella and S.D. He continuously molested S.D. over many years, beginning when she was only seven years old. When S.D. was between the ages of seven to 13 years old, he was "almost constant[ly]" touching her in a sexual way. As we have detailed *ante*, during this time period, the molestation largely occurred in defendant's residence (where S.D. often stayed) and at a nearby parking structure. When the molestation started, she repeatedly told him "no," but he refused to stop. He told her that he was not doing anything wrong, and that she was "seeing things," lying, and acting crazy. She eventually gave up on trying to stop him from touching her in a sexual way when she was between the ages of seven and 10 years old because "it never worked." Although S.D. had a close relationship with her parents, she never told them about the molestation because she felt ashamed and was afraid of being abandoned by them if they found out about it. S.D. also testified that she did not disclose the abuse because Ella already had a "bad relationship" with their family and she did not want Ella to be rejected by the family. In one of the pretext phone calls, S.D. told defendant that she wished things could have been different between them and that he could have been there for her as a friend when she was younger. S.D. reminded defendant that she did not have any friends as a child and was small and alone. In a later

16

pretext call, defendant acknowledged that he knew S.D. was lonely as a child and indicated that this was one of the reasons he "gravitated" to her.

By the time S.D. was 12 years old, she knew that defendant would treat her "poorly" if she resisted him. He would "berate" and punish her if she complained about the molestation. She felt like "[t]here wasn't a choice" and she "couldn't tell him no" because, at that point, the molestation was "deeply imbedded" and something she "had to do." In addition to the stomachache incident that formed the basis for count six, S.D. testified that there were other instances when she became angry at defendant when he was touching her, but he never addressed her anger and did not stop. Because S.D. "knew it would make [the situation] worse," she never did anything when she became angry at defendant. When asked about the molestation that occurred at the parking structure, S.D. said that she did not attempt to avoid going there with defendant because "[i]t wouldn't have made a difference."

As we have described, the evidence at trial showed that the molestation made S.D. feel isolated, alone, and ashamed, and that she was scared of defendant because she had seen him throw things and threaten Ella during arguments. The acts of oral copulation, which began when she was 13 years old, often occurred after defendant became angry and started an argument, and were traumatic because he would yell, scream, and threaten her. She would resist his demands for oral sex until he escalated the situation with an argument to get his way. There were times, typically during an argument, when she knew she had to orally copulate him to "assuage the situation." He would forgive her and/or treat her better after she orally copulated him. There was also evidence that he used his hands to push her head down if she tried to pull away while she was orally copulating him, and, during the incident that formed the basis for count ten, he refused to drive her home until she orally copulated him and swallowed the ejaculate. She was crying while he was yelling at her, and was too afraid to refuse his demand for oral sex. She feared "everything from violence to just berating."

17

When S.D. and defendant had sexual intercourse for the first time, he penetrated her while she was crying. This incident occurred after he had repeatedly pressured her to have sex with him during her entire freshman year of high school, as we have detailed *ante*. She repeatedly refused his demands for sex but eventually acquiesced because she felt like "there was nothing [she] could do" to stop it from happening. Thereafter, at age 14 or 15, she regularly had sex with him on Wednesday mornings. She explained that if she refused to have sex with him, he would argue with her until she orally copulated him.

Considering the totality of the circumstances, we conclude a reasonable jury could find that counts five through fourteen were accomplished by duress, as they were premised on fear and express or implied threats of consequences sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or to acquiesce in an act to which one otherwise would not have submitted. A rational jury could have determined that S.D. was a vulnerable, isolated child who felt compelled to participate in the sex acts giving rise to the challenged convictions based on defendant's position of dominance and authority, his continuous exploitation of her from a young age, and his persistent psychological coercion. The fact that defendant began abusing S.D. at a young age and repeatedly abused her over many years is a relevant factor the jury could consider in finding that defendant accomplished the later sexual abuse by psychological coercion. (*People v. Senior, supra*, 3 Cal.App.4th at pp. 775-776 [duress used in a prior molestation can be evidence supporting duress for later molestations].) Given the evidence adduced at trial, a reasonable jury could have concluded that defendant used duress in the commission of counts five through fourteen. In view of our conclusion, we need not and do not discuss whether there is substantial evidence to support the conclusion that counts five through fourteen were accomplished by other means, such as force.

In support of his argument that insufficient evidence supports a finding of duress, defendant primarily relies on *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*),

18

overruled in part in *Soto, supra*, 51 Cal.4th at p. 248, fn. 12.)  In that case, the defendant was convicted of molesting his 12- or 13-year-old stepdaughter in their home (vaginal and anal intercourse) when they were alone.  (*Hecker*, at pp. 1240-1242.)  The appellate court found there was insufficient evidence of duress because there was no evidence that the defendant expressly or implicitly threatened the victim; the victim admitted she was never consciously afraid the defendant would harm her and testified that with the exception of the defendant pushing her head down during the act of oral copulation, he never used physical force; and although the victim stated she felt " 'pressured psychologically' " and was " 'subconsciously afraid,' " there was no evidence the defendant was aware of and sought to take advantage of such fear.  (*Id*. at p. 1250.)  The *Hecker* court observed, " '[p]sychological coercion' without more does not establish duress.  At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' "  (*Id*. at pp. 1250-1251.)

Hecker is distinguishable for multiple reasons.  First, the court's insufficiency of evidence finding was based on the statement that " '[p]sychological coercion,' " without more, is insufficient to establish duress.  (*Hecker, supra*, 219 Cal.App.3d at p. 1250.)  However, the same court that decided *Hecker* subsequently disagreed with that opinion in *Cochran*.  The *Cochran* court found that the language used in *Hecker* was "overly broad," and clarified that "[t]he very nature of duress is psychological coercion." (*Cochran, supra*, 103 Cal.App.4th at p. 15; see *Veale, supra*, 160 Cal.App.4th at p. 48 [distinguishing *Hecker* on the basis of *Cochran*].)  Further, after *Hecker* was decided, our Supreme Court employed an understanding of duress and coercion in child molestation that parallels *Cochran*, not *Hecker*, describing duress as "us[ing] some form of psychological coercion to get someone else to do something."  (*Soto, supra*, 51 Cal.4th at p. 243; see CALCRIM No. 1111, Bench Notes [indicating that duress is defined by *Soto*, *Leal*, *Pitmon*, and *Cochran*].)  Moreover, as we have described, our finding that there was sufficient evidence of duress is not based *solely* on psychological coercion.

Second, at seven years old, S.D. was significantly younger when the abuse began than the victim in *Hecker*. S.D.'s young age rendered her more susceptible to psychological coercion and defendant's position of authority. (See *Veale, supra*, 160 Cal.App.4th at pp. 43, 50 [six- or seven-year-old victim]; *People v. Pitmon, supra*, 170 Cal.App.3d at pp. 44, 51 [eight-year-old victim]; *Cochran, supra*, 103 Cal.App.4th at p. 15 [nine-year-old victim].) Third, S.D. testified that she feared defendant because she had seen him throw things and threaten her sister during arguments, whereas the victim in *Hecker* was not "consciously afraid" of the defendant. (*Hecker, supra*, 219 Cal.App.3d at p. 1250.) Fourth, unlike *Hecker*, here the record contains evidence that defendant used intimidation, threats, and fear to accomplish the sex acts. Fifth, here defendant used S.D.'s vulnerability to his advantage to continuously exploit her for years, whereas the abuse in *Hecker* involved two incidents that occurred over a one-year period when the victim was 12 or 13 years old. (*Id.* at p. 1241.)

Finally, we reject defendant's attempt to establish an absence of duress by pointing to specific instances of molestation and arguing that there was no duress because he did not use force, violence, or threats to accomplish the *particular* sex act (e.g., the molests at the parking structure and the touching in the schoolgirl outfit). As we have explained, a finding of duress properly turns on a consideration of the totality of the circumstances, including the victim's age and relationship to the defendant, the defendant's position of dominance and authority, the defendant's continuous exploitation of the victim, and evidence of threats of retribution. (See *People v. Cardenas, supra*, 21 Cal.App.4th at p. 940; CALCRIM Nos. 1000, 1015, 1111.) The record, as discussed *ante*, reflects that by the time defendant engaged in the conduct giving rise to counts five through 14, he had consistently disregarded S.D.'s objections to the molestation and punished her (berated her, treated her "poorly") if she failed to comply with his sexual demands. He had created an atmosphere in which S.D. did not object or otherwise resist his inappropriate touching because it had no effect; further, non-compliance resulted in

20

retribution.  This same atmosphere was present in the later instances of molestation that occurred when S.D. was 13 to 15 years old.  Although S.D. attempted to resist defendant's advances during this time period, she eventually acquiesced to his sexual demands because he would continue to argue with her (which included yelling, screaming, and threats) until he got his way.  Under the specific circumstances of this case, a reasonable jury could find duress as to all the challenged counts.

## II

### *Alleged Instructional Error Regarding Lesser Included Offenses*

Defendant contends that counts ten through fourteen must be reversed because the trial court prejudicially erred in failing to instruct the jury on lesser included offenses. We disagree.

A.  *Applicable Legal Principles*

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.]  Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96.)

Courts have "applied two tests in determining whether an uncharged offense is necessarily included within a charged offense:  the 'elements' test and the 'accusatory pleading' test.  Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.) Here, defendant only relies on the accusatory pleading test.

Our Supreme Court has repeatedly held that when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense. (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1160 ["When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading' "], overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *People v. Smith* (2013) 57 Cal.4th 232, 244 [application of the accusatory pleading test "does not require or depend on an examination of the evidence adduced at trial"]; *People v. Montoya* (2004) 33 Cal.4th 1031, 1036 (*Montoya*) ["Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense"].)[5]

We independently review whether the trial court improperly failed to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

B. *Counts Ten, Eleven, and Thirteen: Forcible Oral Copulation*

The accusatory pleading in this case alleged in counts ten, eleven, and thirteen that defendant violated former section 288a, subdivision (c)(2) by accomplishing an act of oral copulation with S.D. against her will by force, violence, duress, menace, and fear of immediate and unlawful bodily injury to her. The pleading indicated that S.D. was 13 or 14 years old with respect to count ten, 14 years old with respect to count eleven, and 15 years old with respect to count thirteen.

---

[5] In *People v. Rush* (1993) 16 Cal.App.4th 20, the Court of Appeal considered evidence from the preliminary hearing in applying the accusatory pleading test. (*Id*. at pp. 22-23, 27.) In *Montoya*, our Supreme Court overruled *Rush* and held that the accusatory pleading test properly considers only that portion of the pleading setting forth the greater offense. (*Montoya, supra*, 33 Cal.4th at p. 1036 & fn. 4.)

Defendant contends the trial court erred in failing to instruct the jury on the lesser included offense of nonforcible oral copulation with a minor in violation of former section 288a, subdivision (b)(2). That section, which is now codified, without substantive change, at section 287, subdivision (b)(2), stated: "Except as provided in Section 288, any person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age is guilty of a felony."

We find no instructional error. Contrary to defendant's contention, nonforcible oral copulation with a minor in violation of former section 288a, subdivision (b)(2) is not a lesser included offense of forcible oral copulation in violation of former 288a, subdivision (c)(2) under the accusatory pleading test. As the jury was instructed here, the elements of forcible oral copulation are: (1) the defendant committed an act of oral copulation with someone else; (2) the other person did not consent to the act; and (3) the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone. (See CALCRIM No. 1015.) None of the elements of this offense relate to the age of the victim. By contrast, nonforcible oral copulation with a minor in violation of former section 288a, subdivision (b)(2) requires that the victim be under the age of 16 and the perpetrator be over the age of 21. It therefore is not a lesser included offense of forcible oral copulation. While defendant correctly points out that the accusatory pleading in this case alleges that S.D. was under 16 years old at the time that each of the forcible oral copulation offenses occurred, the crime of forcible oral copulation has no element relating to the victim's age and the accusatory pleading does not allege that defendant was over 21 years old at the time the offenses were committed. Aside from noting S.D.'s age and the time period in which each crime occurred, the forcible oral copulation offenses alleged in the accusatory pleading simply tracked the statutory definition of the offense. Thus, under the accusatory pleading test, nonforcible oral copulation with a minor in violation of former section 288a, subdivision (b)(2) is not a lesser included offense of forcible copulation in

23

violation of former 288a, subdivision (c)(2), as alleged in counts ten, eleven, and thirteen.[6] As a result, the trial court was not required to instruct the jury as defendant argues.

We reject defendant's contention that the accusatory pleading test includes consideration of evidence adduced at the preliminary hearing. In support of his position, defendant, without elaboration, relies on *People v. Ortega* (2015) 240 Cal.App.4th 956. In that case, the Court of Appeal applied an "expanded accusatory pleading test" and held "[t]he evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Id.* at p. 967.) Even if we assume *Ortega* applies to the circumstances of this case, we decline to follow it. The test adopted in *Ortega* conflicts with decisions issued by our Supreme Court, which has repeatedly held that the trial court need only examine the accusatory pleading when applying the accusatory pleading test. (See, e.g., *People v. Banks*, *supra*, 59 Cal.4th at p. 1160; *People v. Smith, supra,* 57 Cal.4th at p. 244; *Montoya, supra,* 33 Cal.4th at p. 1036.) We are bound by the decisions issued by our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

C. *Counts Twelve and Fourteen: Forcible Rape*

The accusatory pleading in this case alleged in counts twelve and fourteen that defendant violated section 261, subdivision (a)(2) by accomplishing an act of sexual intercourse with S.D., not his spouse, against her will by force, violence, duress, menace,

---

[6] Nor is nonforcible oral copulation with a minor in violation of former section 288a, subdivision (b)(2) a lesser included offense of forcible oral copulation in violation of former section 288a, subdivision (c)(2) under the elements test. (*People v. Scott* (2000) 83 Cal.App.4th 784, 794 & fn. 4.)

24

and fear of immediate and unlawful bodily injury to her, while S.D. was 14 years old (count twelve), and 15 years old (count fourteen).

On appeal, defendant contends the trial court erred in failing to instruct the jury on the lesser included offense of unlawful sexual intercourse with a minor in violation of 261.5, subdivision (d). Section 261.5, subdivision (b) states: "Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a 'minor' is a person under the age of 18 years and an 'adult' is a person who is at least 18 years of age." "[S]ubdivision (a) of section 261.5 does not by itself set forth a substantive offense. Rather, subdivision (a) acts in concert with the other subdivisions (subds. (b), (c), or (d)), to set out a  substantive offense." (*People v. Woods* (2015) 241 Cal.App.4th 461, 478 (*Woods*).)  Defendant asserts that, under the facts as alleged in the accusatory pleading, he could not have committed forcible rape (§ 261, subd. (a)(2)) without also engaging in an act of unlawful sexual intercourse with a minor in violation of section 261.5, subdivision (d). (AOB 76)  That provision states: "Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony . . . ." (§ 261.5, subd. (d).)

As the jury was instructed here, the elements of forcible rape (§ 261, subd. (a)(2)) are:  (1) the defendant had sexual intercourse with a woman; (2) the defendant and the woman were not married to each other at the time of the intercourse; (3) the woman did not consent to the intercourse; and (4) the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or someone else. (CALCRIM No. 1000.)  None of the elements of this offense relate to the age of the victim. By contrast, unlawful sexual intercourse with a minor in violation of 261.5, subdivision (d) requires that the victim be under the age of 16 and the perpetrator be 21 years of age or older. It therefore is not a lesser included offense of

25

forcible rape. While defendant correctly points out that the accusatory pleading in this case alleges that S.D. was under 16 years old at the time each of the forcible rape offenses occurred, the crime of forcible rape has no element relating to the victim's age and the accusatory pleading does not allege that defendant was over 21 years of age or older at the time of the offenses. Aside from noting S.D.'s age and the time period in which each crime occurred, the forcible rape counts alleged in the accusatory pleading simply tracked the statutory definition of the offense. Thus, under the accusatory pleading test, unlawful sexual intercourse with a minor in violation of 261.5, subdivision (d) is not a lesser included offense of forcible rape in violation of section 261, subdivision (a)(2) as alleged in counts twelve and fourteen.[7] (See *Woods, supra*, 241 Cal.App.4th at pp. 478-482 [concluding that unlawful sexual intercourse with a minor was not a lesser included offense of forcible rape under the accusatory pleading test where the information did not allege that the victim was a minor, her age, or the perpetrator's age at the time of the intercourse].) As a result, the trial court was not required to instruct the jury on the offense of unlawful sexual intercourse with a minor as a lesser included offense of the charged counts of forcible rape. For the reasons we have already discussed, we reject defendant's contention that the accusatory pleading test includes consideration of evidence adduced at the preliminary hearing.

III

*Admission of Propensity Evidence Under Evidence Code Section 1108*

Defendant contends the trial court prejudicially erred in admitting evidence of uncharged sexual misconduct under Evidence Code section 1108. We disagree.

---

[7] Nor is unlawful intercourse with a minor (§ 261.5) a lesser included offense of forcible rape (§ 261, subd. (a)(2)) under the elements test. (*Woods, supra,* 241 Cal.App.4th at p. 479.)

A.  *Applicable Legal Principles*

California law generally prohibits the introduction of character evidence to prove a defendant's propensity to commit conduct on a specific occasion.  (Evid. Code, § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911.)  Evidence Code section 1108 is an exception to the general rule.  It provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evid. Code] Section 1101, if the evidence is not inadmissible pursuant to [Evid. Code] Section 352."  (§ 1108, subd. (a).)  Evidence Code section 1108 thus permits the admission of evidence that the defendant in a sexual offense prosecution "committed other sexual offenses to prove his propensity to commit the charged sexual offenses." (*People v. Cottone* (2013) 57 Cal.4th 269, 281.)  "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters. [Citations.]  The court's ruling admitting the evidence is reviewed for abuse of discretion." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

"To determine whether [Evid. Code] section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under [Evid. Code] section 352.  [Citation.]  'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823-824.)

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' " 'Evidence is not prejudicial, as that term is used [in the statute], merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, [an Evid. Code] section 352 objection should fail. [Citation.] " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evid. Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" [Citation.] [¶] The prejudice that [Evid. Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " ' " ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

We review for abuse of discretion. " ' "[R]eversal is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

B. *Additional Background*

Prior to trial, the prosecution filed a motion requesting permission to introduce evidence of an uncharged act of sexual misconduct committed by defendant. The evidence proffered by the prosecution related to an alleged sexual assault by defendant that occurred in or around 2002. Prior to the alleged assault, N.D., her older sister (K.D.),

28

and K.D.'s friend (D.D.) were all hanging out and drinking alcohol at defendant's apartment. N.D., who was approximately 15 years old, did not know defendant. She knew D.D., who is S.D. and Ella's cousin. When N.D. started to feel ill, defendant suggested that she go upstairs and lie down. Later, while N.D. was asleep, defendant allegedly inserted his fingers into her vagina, which caused her to wake up. She became hysterical, screamed, and ran downstairs to K.D. and D.D. N.D.'s mother was called but the incident was not reported to law enforcement. The prosecution argued that the proffered evidence was admissible under Evidence Code section 1108 to prove defendant's propensity to commit the sex offenses charged in this case, and that the relevant factors weighed in favor of admitting the evidence under Evidence Code section 352.

On the same day as the prosecution filed its motion, the defense filed a document indicating that it intended to make an oral motion seeking to exclude any reference to defendant's alleged sexual assault of N.D.

After hearing argument from counsel, the trial court ruled that the uncharged sexual misconduct evidence was admissible. In doing so, the court stated: "[The evidence] will be admitted pursuant to 1108. I don't find it unduly prejudicial. It's well within the ambit of what the legislature intended in the passage of 1108 of the Evidence Code."

At trial, N.D. and D.D. testified as prosecution witnesses about the uncharged act of sexual misconduct. Ella testified about the incident for the defense, and K.D. testified as a rebuttal witness.

Prior to deliberations, the trial court instructed the jury pursuant to CALCRIM No. 1191A (Evidence of Uncharged Sex Offense) as follows: "The People presented evidence that the defendant committed a crime against [N.D.], specifically a lewd and lascivious act, to wit, his finger to [N.D.'s] vagina. That was not charged in this case. The definition of such a crime is provided in instruction 1112, which I will give you in a

29

moment. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged in this case. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged in this case. The People must still prove each charge beyond a reasonable doubt."

C. *Analysis*

We reject defendant's initial contention that Evidence Code section 1108 is facially invalid because it violates a defendant's constitutional rights to due process and a fair trial. In making this argument, defendant acknowledges that our Supreme Court has held that the statute does not violate due process principles. (*People v. Falsetta, supra,* 21 Cal.4th at pp. 907, 915-922; see also *People v. Rhoades* (2019) 8 Cal.5th 393, 415 [rejecting contention that Evid. Code, § 1108 violated defendant's due process and fair trial rights]; *People v. Molano* (2019) 7 Cal.5th 620, 664 [noting that the court has repeatedly declined to reconsider its holding in *Falsetta*].) He only raises the due process argument here to preserve the issue for further review. Because we are bound by decisions issued by our Supreme Court (*Auto Equity, supra,* 57 Cal.2d at p. 455), no further discussion of this issue is required.

30

We also reject defendant's "as-applied" challenge to Evidence Code section 1108. According to defendant, reversal is required because allowing the prosecutor to introduce propensity evidence under Evidence Code sections 1108 and 352, in combination with instructing the jury with CALCRIM No. 1191A, effectively lowered the prosecution's burden of proof in violation of his constitutional rights to due process and a fair trial. He argues that it was "unfair and unnecessary" to allow the prosecution to argue that he had a propensity to commit the charged sex offenses because a preponderance of the evidence supported the conclusion that he had committed a prior similar uncharged sex offense against a different victim. He further argues that, "[b]ecause the only contested issue as to the current charges was whether [he] or [S.D.] was the one telling the truth," allowing the evidence "gave a false aura of credibility to [S.D.] and lowered the prosecution's burden" of proof.

Preliminarily, we note that defendant's claim of evidentiary error is forfeited for failure to object on the same ground in the trial court. (*People v. McKinnon* (2011) 52 Cal.4th 610, 674.) In any event, we find no merit in defendant's argument. As a panel of this court recently explained in *People v. Phea* (2018) 29 Cal.App.5th 583, CALCRIM No. 1191A is a correct statement of the law and to apply the preponderance standard to evidence admitted under Evidence Code section 1108 does not reduce the prosecution's burden of proof as to the *charged* offenses. (*Phea*, at pp. 608-609, citing *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016 (*Reliford*).)[8] Defendant's contention that Evidence Code section 1108's propensity inference resulted in a lower burden of proof for the prosecution is belied by the trial

---

[8] "In March 2017, CALCRIM No. 1191 was modified to distinguish uncharged offenses offered as propensity evidence from charged offenses offered for that purpose. CALCRIM No. 1191A now applies to the former, while CALCRIM No. 1191B applies to the latter." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1.)

31

court's instructions to the jury. The CALCRIM No. 1191A instruction, as given here, stated that if the jury found by a preponderance of the evidence that defendant committed the uncharged sexual offense against N.D., it could, but was not required to, conclude that he was disposed or inclined to commit sexual offenses and that it was likely he committed the charged sexual offenses, but that conclusion was "only one factor to consider along with all the other evidence" and was "not sufficient by itself" to prove the charged offenses: "The People must still prove each charge beyond a reasonable doubt." The jury also was instructed that the People had the burden to prove that defendant was guilty beyond a reasonable doubt, and that whenever the instructions indicate that the People must prove something, it means they must prove it beyond a reasonable doubt, unless the instruction says otherwise. (CALCRIM No. 220 (Reasonable Doubt).) We presume the jury understood and followed these instructions. (*Edwards, supra,* 57 Cal.4th at p. 746.) Therefore, we conclude that the prosecution's burden of proof was not lowered here.

Finally, we reject defendant's contention that the trial court abused its discretion in failing to exclude the proffered propensity evidence under Evidence Code section 352. Although defendant acknowledges that the weighing process under that statute depends upon the trial court's consideration of the unique facts and issues of each case (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314), his briefing fails to identify all the relevant factors and explain how the trial court abused its discretion in weighing those factors under the circumstance of this case. Instead, he simply asserts that the propensity evidence would have been excluded under Evidence Code section 352 had "the trial court engaged in the 'closely reasoned' weighing process mandated by [the statute], as the prior sex crimes evidence was so similar to the charged offenses as to have the highest degree of prejudicial impact attached to it." This showing is insufficient to establish an abuse of discretion. "Although a 'trial judge need not expressly weigh prejudice against probative value--or

32

even expressly state that he has done so' " (*People v. Brooks* (2017) 3 Cal.5th 1, 40), here, the record reflects that the trial court performed its duty to balance the probative value of the propensity evidence against its prejudicial impact. The pretrial motion filed by the prosecution identified the relevant factors a trial court must consider in deciding whether to admit propensity evidence under Evidence Code section 1108. In ruling that the evidence was admissible, the trial court expressly stated that the evidence was not "unduly prejudicial." Indeed, defendant's primary complaint about the admission of the propensity evidence, it was unduly prejudicial because the uncharged sexual misconduct was similar to the charged sex offenses, is a factor that weighs in *favor of admissibility*. (*People v. Rhoades*, *supra*, 8 Cal.5th at p. 413 ["evidence of any prior sexual offense is considered relevant under Evid. Code, § 1108, but its probative value is increased by relative similarity of the crimes"]; see also *People v. Robertson* (2012) 208 Cal.App.4th 965, 992; *People v. Hollie, supra*, 180 Cal.App.4th at p. 1274.) We see no error.

## IV

### *CALCRIM No. 1191A*

Defendant contends reversal is required because CALCRIM No. 1191A is invalid. He argues the pattern instruction impermissibly allows jurors to infer guilt on the charged offenses based on the commission of an uncharged offense, which must only be proved by a preponderance of the evidence. He further argues the instruction confused and mislead the jury about the burden of proof in violation of his due process rights. In making these arguments, defendant acknowledges that our Supreme Court has held that a predecessor instruction was a correct statement of the law. (*Reliford, supra*, 29 Cal.4th at p. 1016 [holding that CALJIC No. 2.50.01 is a correct statement of the law]; see also *People v. Villatoro, supra*, 54 Cal.4th at p. 1160 [noting that there is " 'no material difference' " between CALCRIM No. 1191 and its predecessor, CALJIC No. 2.50.01].) He also acknowledges that we are bound to follow that precedent (*Auto Equity, supra,* 57 Cal.2d at p. 455), and only raises the issue to preserve it for further review.

33

As a panel of this court recently explained, all but one of defendant's arguments concerning CALCRIM No. 1191A are foreclosed by the analysis and conclusions in *Reliford*. (*People v. Phea, supra*, 29 Cal.App.5th at p. 609, citing *Reliford, supra*, 29 Cal.4th at pp. 1013-1016.) For the reasons stated in *Phea*, which addressed a similar argument, we also reject defendant's remaining contention, that CALCRIM No. 1191A contradicts CALCRIM No. 224 (Circumstantial Evidence: Sufficiency of Evidence)[9] by telling jurors they may use facts proved only by a preponderance of the evidence to infer the defendant has a disposition to engage in sexual offenses, and may conclude the defendant is likely to commit the charged offenses if they conclude he has such a disposition. (See *Phea*, at pp. 609-615.)

V

*Child Sexual Abuse Accommodation Syndrome (CSAAS) Evidence*

Defendant contends the trial court prejudicially erred in admitting expert testimony on CSAAS, which explains "common stress reactions of children who have been sexually molested . . . which also may include the child's failure to report, or delay in reporting, the abuse." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) Noting his claim of evidentiary error has been forfeited due to the failure to object in the trial court (*People v. Dykes* (2009) 46 Cal.4th 731, 756), defendant alternatively argues trial counsel rendered ineffective assistance. We agree as to forfeiture but disagree that defendant has carried his burden to show ineffective assistance of counsel.

---

[9] Like in *Phea*, defendant relies on the first paragraph in CALCRIM No. 224, which provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."

34

A.  *Additional Background*

Prior to trial, the prosecution filed a motion requesting permission to call Dr. Blake Carmichael as an expert witness in the field of CSAAS for the purpose of dispelling certain misconceptions the jury might hold as to how sexually abused children react to the abuse, which may assist the jury in evaluating the credibility of the alleged victim.  Defendant did not file a written opposition to the motion or object at any time to the admission of CSAAS evidence.

At trial, Dr. Carmichael, a clinical psychologist at the University of California, Davis, Children's Hospital,[10] testified as an expert witness in the areas of child sexual abuse and the effect of child sexual abuse on children.  Defense counsel did not object during Carmichael's testimony.

As relevant here, Dr. Carmichael testified on direct examination that CSAAS is a group of concepts that helps explain the behavior of children who have been sexually abused.  He emphasized that CSAAS is based on research of children who have been sexually abused and is not a diagnostic tool used to predict or determine whether a child has been sexually abused, but is used to educate people on the behavior patterns child sexual abuse victims tend to display and to dispel misconceptions about such victims.  The behavior patterns include secrecy, helplessness, accommodation, and delayed disclosure.

Dr. Carmichael testified in detail about the behavior patterns, explaining that it is common for sexually abused children to keep the abuse a secret, feel helpless to make it stop, and delay in reporting the abuse.  He explained that children are not typically abused by a stranger, but instead by someone who they know, trust, and care about.  He also explained that abused children often ignore or "tune out" the abuse while it is

---

[10]  Dr. Carmichael stated that he worked at the CARE Center, meaning the Child Adolescent Abuse Resource Education Diagnostic and Treatment Center.

occurring as a way to cope with it, and that most children do not immediately report the abuse. He stated that about 75 percent of abused children do not report the abuse within the first year, and that around 40 to 50 percent do not disclose the abuse until after they turn 18 years old. He noted that only about 20 percent of children report the abuse "quickly." He identified a variety of reasons for the delayed disclosure, including, fear, shame, guilt, and a desire on the victim's part to avoid getting into trouble or being judged or blamed for the abuse. He noted that a child may also delay in disclosing the abuse to prevent the perpetrator from getting into trouble, especially if the child has a loving, caring relationship with the perpetrator. Carmichael explained that a child may be more reluctant to immediately report the abuse if they feel like the recipient of the report is not going to believe them or will act in a hostile or angry way. He also explained that when a child has a close relationship with the perpetrator, they tend not to disclose the abuse for a longer period of time, and to have a heightened sense of helplessness, amplified if he or she lives with the perpetrator.

Dr. Carmichael explained that children who have been consistently abused for many years have a difficult time remembering the details of specific incidents of abuse and when those incidents occurred. He also explained that it is not uncommon for a child to give up on trying to make the perpetrator stop abusing them when they realize their efforts are ineffective. When asked, he indicated that it is not uncommon for a relationship between an abuser and a victim to continue after the victim turns 18, and for the victim to continue to engage in the behavior patterns exhibited by children who have been sexually abused, including secrecy.

At the conclusion of direct examination, Dr. Carmichael stated that he was not aware of the facts of this case, and that he was not called by the prosecution to offer an opinion as to whether or not the alleged victim in this case had been sexually abused. He indicated that it was up to the jury to make that determination. He also acknowledged that "there are some people who take issue with [CSAAS] . . . [because] it can't predict if

36

someone was sexually abused." He then said, "we all agree, you can't predict or use a tool to determine if a kid was sexually abused. That's why we have the law process and juries."

On cross-examination, defense counsel asked Dr. Carmichael if there was a common set of circumstances in which a delayed report of abuse is also a false report. Carmichael responded, "What we find . . . in the literature [is] that . . . false reports of sexual abuse are rare. Anywhere between 2 and 6 percent or so according to the research. [¶] And what we're actually finding is that the false reports of sexual abuse usually come from the parents and it's more typical in custody evaluations or custody disputes. And even in those circumstances where there were higher rates of false allegations, they were coming from the parents and not the victims themselves." When defense counsel asked whether the two to six percent of false reports concerned young children, Carmichael stated, "Abuse that occurred while they were children. And, again, in those cases, some of those studies, none of the children made false allegations of sexual abuse." Upon further questioning about false reporting, Carmichael stated, "What we're finding is that false reports of sexual abuse are rare, very low. That's what we are finding."

### B. *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, defendant must show: (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance. In determining prejudice, the inquiry is whether there is a reasonable probability that, but for counsel's deficiencies, defendant would have obtained a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694; *People v. Frye* (1998) 18 Cal.4th 894, 979, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* at p. 694; *In re Harris*

37

(1993) 5 Cal.4th 813, 833.) "[T]he question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " (*In re Harris*, at p. 833.) To show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland*, at p. 693.)

C. *Expert Testimony Regarding CSAAS*

Defendant first contends that trial counsel rendered ineffective assistance by failing to object to the CSAAS evidence elicited on direct examination because: (1) the evidence lacked probative value and was not relevant to the facts of this case; (2) the evidence does not meet the legal requirements for the admissibility of scientific evidence; (3) expert testimony on the subject is not required, and allowing such evidence has the effect of bolstering the victim's credibility based on the misuse of "pseudoscience"; and (4) the evidence lacks foundation and is unduly prejudicial under Evidence Code section 352. We disagree.

Numerous courts have found expert testimony concerning CSAAS properly admitted in sexual abuse cases. (See, e.g., *In re S.C.* (2006) 138 Cal.App.4th 396, 418 [collecting cases]; see also *McAlpin, supra,* 53 Cal.3d at pp. 1300-1301.) Our supreme court has explained that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident -- e.g., a delay in reporting -- is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin,* at pp. 1300-1301, fn. omitted; see *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 [where the victim's credibility is placed at issue due to seemingly counterintuitive behavior, including a delay in reporting

molestation, CSAA evidence is pertinent and admissible to rehabilitate the victim's credibility by showing that his or her reactions are not inconsistent with abuse].)

Here, S.D.'s credibility was the central issue at trial. She delayed reporting the sexual abuse for a substantial period of time and admitted that she gave up on trying to stop defendant from molesting her when she between the ages of seven and 10 years old. She also admitted that she continued to have a relationship with defendant for years after the molestation began, including living with him and repeatedly having sex with him between the ages of 14 and 24. As previously indicated, the defense theory was fabrication of all claims beyond the consensual sexual relationship after the victim was 18. The defense posited that S.D. was lying about the molestation because she did not want her family to reject her for having a sexual relationship with her sister's boyfriend. On cross-examination, defense counsel attacked S.D.'s credibility by suggesting that her conduct following the alleged molestation was inconsistent with her testimony claiming the molestation occurred, including her conduct in continuing to spend the night at defendant's residence and living with him during high school and in college, going on trips with him as an adult, repeatedly having sexual intercourse with him as an adult, and "express[ing] loving sentiment" to him in birthday and Valentine's Day cards. On this record, the prosecution was entitled to present CSAAS evidence, which was relevant and admissible as to S.D.'s credibility. We reject defendant's claim that jurors no longer harbor confusion or misconceptions about how children react to sexual abuse. And we decline to overturn California's long-standing rule allowing CSAAS evidence where, as here, the victim's credibility is placed at issue due to counterintuitive behavior. We are bound to follow our Supreme Court's decision permitting the admission of CSAAS evidence for the limited purpose it was admitted here. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; *Auto Equity, supra,* 57 Cal.2d at p. 455.) For that reason, defendant's reliance on out-of-state cases that find CSAAS evidence inadmissible is misplaced.

Trial counsel was not deficient for failing to object to the CSAAS testimony because it fails to satisfy the legal requirements for the admissibility of new scientific methodologies under *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Kelly/Frye* rule). The *Kelly/Frye* rule does not apply where, as here, the CSAAS testimony is admitted " 'for the limited purpose of disabusing [the] jury of misconceptions it might hold about how a child reacts to a molestation.' " (*People v. Wells* (2004) 118 Cal.App.4th 179, 188.) When introduced for that purpose, and when, as here, the evidence is limited to the expert's own clinical experience and familiarity with relevant professional literature, the CSAAS evidence does not implicate *Kelly/Frye* principles. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448-449.)

Finally, we reject defendant's contention that trial counsel was deficient for failing to object to the CSAAS evidence on the ground it was unduly prejudicial under Evidence Code section 352. As discussed above, S.D.'s credibility was the critical issue at trial and she admitted conduct that was arguably inconsistent with having been sexually abused by defendant. Thus, Dr. Carmichael's testimony regarding arguably inconsistent behaviors was highly probative for the purpose of rebutting common misperceptions about how a child *should* react to sexual abuse. The testimony helped the jury place into a proper context S.D.'s delayed reporting and her continuous contact with her abuser. Nor was the considerable probative value of the CSAAS evidence substantially outweighed by its prejudicial impact. We are not persuaded by defendant's contention that he was "unfairly disadvantage[d]" by the CSAAS evidence because "it allows no possibility for the reality that a witness has credibility problems, actually lied, and/or the abuse never happened." Carmichael explained that the purpose of CSAAS evidence was to educate people about the behavior of children who have been sexually abused and to dispel misconceptions about them. He emphasized that CSAAS is not a diagnostic tool and that he was not called to offer an opinion as to whether or not S.D. had been sexually abused by defendant. He said that it was the jury's role to make that determination. On this record,

40

we cannot conclude that trial counsel was deficient for failing to object to the CSAAS evidence under Evidence Code section 352; the objection would not have been well taken.

D. *Expert Testimony Regarding False Allegations of Sexual Abuse*

Defendant next contends that trial counsel rendered ineffective assistance by failing to object when Dr. Carmichael testified on cross-examination that false reports of sexual abuse are and typically made by a parent involved in a custody dispute and not from the victims themselves. The Attorney General agrees that this testimony was improper, but argues forfeiture and harmless error.

We agree with the parties that admission of this testimony was error. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885-886 [concluding similar statistics were not admissible as CSAAS evidence]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 569-571.) However, we conclude that defendant has not shown a reasonable probability that, but for the evidentiary error to which his counsel failed to object, the outcome of the proceeding would have been more favorable to him. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 694-694.)

Contrary to defendant's contentions, we conclude here that Dr. Carmichael's testimony about false reports of child abuse was not "tantamount" to improper vouching for the credibility of the victim, nor did it supplant the jury. As we have explained, Carmichael did not express an opinion on whether S.D. had been sexually abused. He did not testify that he believed S.D. was telling the truth or that he thought defendant was guilty of sexually abusing her. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [expert testimony that codefendant was credible should have been excluded on proper objection]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [trial court erred in permitting police officers to testify that in their opinion a certain witness was credible].) Rather, as we have discussed, he expressly declined to opine on this case or S.D.'s credibility and added that it was the jury's decision, not his.

41

Under the circumstances of this case, we are not persuaded that there is a reasonable probability that, but for the improper testimony, defendant would have obtained a more favorable outcome. The challenged testimony was brief in duration and the case against defendant, independent of the challenged testimony, was strong. The challenged testimony comprises only about two pages of the reporter's transcript, which spans over 800 pages from opening statements through closing arguments. By contrast, S.D., who was 26 years old at the time of trial, testified at length about the molestation, giving the jury ample opportunity to assess her credibility. (*People v. Wilson*, *supra*, 33 Cal.App.5th at p. 572 [finding no prejudice in admitting statistical evidence about false allegations where expert's testimony was brief and complaining witnesses testified extensively].) The jury also heard the audio recordings of the pretext phone calls and testimony regarding an uncharged act of sexual misconduct involving defendant, which, as we have described, was highly probative. As we have set forth *ante*, during the pretext calls defendant did not deny the accusations of abuse and only took exception to the characterization of his conduct as "rape"; further, he apologized and showed remorse.

Finally, in closing argument, the prosecutor did not mention the statistical evidence and specifically told the jury that Dr. Carmichael "was not here to tell you that [S.D.] was molested or that [she] was sexually assaulted. That is your decision for each and every single one of these counts, that decision is up to you. The reason you heard from Dr. Carmichael is to put [S.D.'s] actions in context."[11] The jury was specifically instructed that Carmichael's testimony was not evidence that any molestation occurred, and that his testimony could only be considered in deciding whether or not S.D.'s

---

[11] In closing argument, defense counsel told the jury that Carmichael's testimony "really isn't helpful." Counsel noted that Carmichael admitted that people lie about sexual abuse when they have a "good reason" or a "big motive to tell a big lie," and "[t]hat's all you need to understand from Dr. Carmichael."

42

conduct was inconsistent with the conduct of someone who has been molested and evaluating the believability of her testimony. (CALCRIM No. 1193.) The jury was further instructed that it was the sole judge of the facts (CALCRIM No. 222 (Evidence)) and the credibility of the witnesses (CALCRIM No. 226 (Witnesses)), and that "certain evidence was admitted for a limited purpose," and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303 (Limited Purpose Evidence in General)). We presume the jury understood and followed these instructions. (*Edwards*, *supra*, 57 Cal.4th at p. 746.)

On this record, we conclude there was no prejudice from the erroneous admission of the improper evidence and the failure to object thereto.

VI

*CALCRIM No. 1193*

Defendant contends that reversal is required because CALCRIM No. 1193 is invalid as it erroneously instructs the jury that it may use CSAAS evidence to determine the credibility of the victim and to corroborate the victim's claims of abuse, thereby lowering the prosecution's burden of proof in violation of his constitutional rights to due process and a fair trial.[12] We disagree.

We independently determine whether a jury instruction correctly states the law. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767.) Review of the adequacy of an instruction is based on whether the trial court fully and fairly instructed on the applicable law. (*Ibid*.) When reviewing a purportedly erroneous instruction, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

---

[12] Defense counsel did not object to the instruction at trial but, as the People concede, we may review the merits of the claim to determine whether defendant's substantial rights were affected. (§ 1259; *People v. Felix* (2008) 160 Cal.App.4th 849, 857.)

43

We consider the instruction as a whole and assume that the jurors are intelligent persons and capable of understanding and correlating all the instructions which are given. (*Riley*, at p. 767.) A jury instruction should be interpreted, if possible, to support the judgment rather than defeat it, if it is reasonably susceptible to such interpretation. (*Ibid.*)

Here, the jury was instructed with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Carmichael regarding [CSAAS]. [¶] Dr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [S.D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

CALCRIM No. 1193 is a correct statement of the law. CSAAS evidence is properly considered to evaluate whether the victim's conduct as demonstrated by the evidence was inconsistent with having been molested, and to help the jury evaluate credibility, i.e., the believability of the victim's testimony. (*McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; see also *People v. Housley* (1992) 6 Cal.App.4th 947, 958-959.) Contrary to defendant's contention, the instruction does not lower the prosecution's burden of proof.; it specifically states that CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him," and that the jury "*may*" consider the evidence "*only* in deciding whether or not [S.D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The instruction does not state or imply that jurors could consider the CSAAS evidence to corroborate S.D.'s claims of molestation. Further, the challenged instruction cannot be read in isolation; it must be considered in the context of the instructions as a whole. As relevant here, the jury was instructed on the presumption of innocence and the prosecution's burden of proof (CALCRIM No. 220), and how to evaluate witness credibility (CALCRIM No. 226) and conflicting evidence (CALCRIM No. 302). It was instructed to "[p]ay careful attention to all of the[] instructions and

44

consider them together" (CALCRIM No. 200 (Duties of Judge and Jury)), and that "certain evidence was admitted for a limited purpose," and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303). The jury was further instructed that it was not required to accept as true or correct expert testimony and it "may disregard any opinion that [it found] unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332 (Expert Witness Testimony).) We presume the jury understood and followed the court's instructions, including the prosecution's burden of proof. (*Edwards*, *supra*, 57 Cal.4th at p. 746.) We conclude that it is not reasonably likely that the jury understood CALCRIM No. 1193 in the manner suggested by defendant.

VII

*Fines and Fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant contends the trial court violated his constitutional rights by imposing restitution fines (§§ 1202.4, 1202.45) and mandatory court operations and court facilities assessments (§ 1465.8; Gov. Code, § 70373) without first determining his ability to pay them. He asserts that the fines and assessments must be stricken or stayed until the prosecution proves he has the ability to pay them. We disagree.

A. *Additional Background*

Prior to sentencing, the probation officer filed a report recommending the trial court impose various fines and fees, including a restitution fine in the amount of $10,000 under section 1202.4, and a matching stayed parole revocation restitution fine under section 1202.45. At sentencing, the trial court followed the recommendation of the probation officer with respect to the restitution fines. The abstract of judgment and sentencing minute order reflect that the court imposed a $40 court operations assessment under section 1465.8, and a $30 court facilities assessment under Government Code section 70373, for each of defendant's 13 convictions. Neither set of assessments,

45

however, was orally imposed.  Defendant did not object in the trial court based on an inability to pay.

B.  *Court Operations and Court Facilities Assessments*

While an oral pronouncement of judgment generally controls over the minutes and abstract of judgment (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385), until recently it appeared settled that the court operations and court facilities assessments are mandatory "and may be added on review" (*People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2).  The rule that court operations and court facilities assessments are mandatory regardless of ability to pay was analyzed in *Dueñas*, which held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

We are not persuaded that the *Dueñas* analysis is correct.  We join the courts that have concluded *Dueñas* was wrongly decided and hold that principles of due process do not require determination of a defendant's " 'present ability to pay' " before imposing mandatory court operations and court facilities assessments.[13]  (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th

_____

[13] Our Supreme Court is now poised to resolve the question of whether *Dueñas* was correctly decided, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4.  (*Kopp,* at pp. 95-96.)  The Supreme Court limited review in *Kopp* to whether courts must consider a defendant's ability to pay in imposing fines, fees and assessments; and, if so, which party bears the burden of proof regarding defendant's inability to pay.

1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)  As a consequence, we will not strike the assessments from the abstract of judgment and sentencing minute order.  Instead, because the assessments are mandatory, we will modify the judgment to impose a $520 court operations assessment under section 1465.8, and a $390 court facilities assessment under Government Code section 70373.

       C. *Restitution Fine*

In addition to its holding regarding court operations and court facilities assessments, the *Dueñas* court held that "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the [restitution fine] over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine."  (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)

As an initial matter, we agree with the People that defendant has forfeited his claim of sentencing error by failing to object to the restitution fine in the trial court.  (*People v. Case* (2018) 5 Cal.5th 1, 53; *People v. Nelson* (2011) 51 Cal.4th 198, 227.)[14]  But even if the claim were preserved for appellate review, it fails on the merits.  As we have explained, we join the courts holding that principles of due process do not require determination of a defendant's present ability to pay before imposing any restitution fine.  (See, e.g., *People v. Kingston*, *supra*, 41 Cal.App.5th at p. 279.)  To the

---

**14** Whether defendant had the ability to pay the restitution fine clearly presents a factual issue.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153.)  Defendant was therefore required to object in the trial court to preserve the issue for appeal.  Section 1202.4, subdivision (d) expressly requires the trial court to consider a criminal defendant's inability to pay a restitution fine in excess of the statutory minimum and places the burden of proof on the defendant to do so.  An objection on this basis "would not have been futile under governing law at the time of his sentencing hearing."  (*Frandsen*, at p. 1154.)

extent *Dueñas* can be read to hold that the prosecution bears the burden of showing a defendant has the ability to pay any restitution fine (*Dueñas, supra*, 30 Cal.App.5th at p. 1172), we disagree with that holding.

When, as here, a restitution fine is imposed above the statutory minimum, "[a] defendant shall bear the burden of demonstrating his or her inability to pay.  Express findings by the court as to the factors bearing on the amount of the fine shall not be required.  A separate hearing for the fine shall not be required."  (§ 1202.4, subd. (d); see *People v. Avila* (2009) 46 Cal.4th 680, 729 ["the statute 'impliedly presumes a defendant has the ability to pay," and leaves it to the defendant to adduce evidence otherwise"].)  Here, the trial court imposed the maximum restitution fine of $10,000 in compliance with the procedural requirements of the statute and nothing indicates that the court did not consider the relevant statutory factors, including defendant's inability to pay and the seriousness and gravity of the offenses, in imposing the fine.  (§ 1202.4, subd. (d).)  As in *Nelson*, defendant " 'points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration.  Nor does he identify anything in the record indicating the trial court breached its duty to consider his ability to pay; as the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor.  Thus, we cannot say on this record that the trial court abused its discretion.' " (*People v. Nelson, supra*, 51 Cal.4th at p. 227.)

VIII

*Custody Credit*

Defendant contends, and the People concede, that the judgment must be modified to reflect that he is entitled to one additional day of custody credit.  We agree.

"A defendant is entitled to actual custody credit for 'all days of custody' in county jail . . ., including partial days.  [Citations.]  Calculation of custody credit begins on the

day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)

"Section 4019 governs the award of presentence conduct credits." (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310.) Section 2933.1, subdivision (c), provides in relevant part: "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in . . . a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." Section 2933.1, subdivision (a), applies to "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5." Forcible rape is listed in section 667.5, subdivision (c)(3). Forcible oral copulation is listed in section 667.5, subdivision (c)(5). Lewd or lascivious act in violation of subdivision (a) or (b) of section 288 is listed in section 667.5 subdivision (c)(6).

Here, the record discloses that defendant was arrested on October 13, 2016, and sentenced on August 31, 2018. At sentencing, the trial court correctly awarded defendant 688 days of actual custody credit. The court, however, erred in only awarding defendant 102 days of conduct credit pursuant to section 2933.1. Defendant should have been awarded 103 days of conduct credit, as he was entitled to a 15 percent credit for his actual period of confinement. Thus, he should have been awarded a total of 791 days of custody credit, comprised of 688 actual custody credit, plus 103 days of conduct credit. We will order that the sentencing minute order and abstract of judgment be modified to correct this error.

## DISPOSITION

The judgment is modified to impose a $520 court operations assessment under section 1465.8 and a $390 court facilities assessment under Government Code section 70373 and also to reflect one additional day of conduct credit, resulting in a total of 791 days of custody credit.  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy thereof to the Department of Corrections and Rehabilitation.


                                                                    /s/
                                                                Duarte, J.

We concur:

     /s/
Hull, Acting P. J.

     /s/
Renner, J.